UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| CVS PHARMACY, INC., <br>     Plaintiff, <br><br> v. <br><br> JOHN LAVIN, <br>     Defendant. | ) <br> ) <br> ) <br> ) <br> )   C.A. No. 19-204-JJM-PAS <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

This case involves the propriety and application of a non-compete agreement. John Lavin worked for CVS Pharmacy, Inc. as a senior executive for 27 years. He signed a Restrictive Covenant Agreement ("Agreement") in 2017. Within two years of signing the Agreement, Mr. Lavin resigned from CVS and started employment with the PillPack unit of Amazon ("PillPack").

CVS sued Mr. Lavin and the Court granted a temporary restraining order to maintain the status quo. CVS now seeks a preliminary injunction. ECF No. 27. The parties have fully briefed and argued this matter. ECF Nos. 27, 33, 36. All parties waived presentation of testimony but filed substantial and extensive evidence by affidavits attached to their papers. ECF No. 27-1 through 27-8, 30, 33-1 through 33-3, 38, 39.

Because the Court finds the Agreement enforceable and applicable to Mr. Lavin's new employment with PillPack, the Court GRANTS CVS's Motion for a Preliminary Injunction. ECF No. 27.

## I. BACKGROUND

Mr. Lavin was a Senior Vice President responsible for leading CVS Caremark's Retail Network. He began work there in the early 1990s. His team totaled 250 employees.

Mr. Lavin negotiated with retail pharmacies on behalf of CVS Caremark, a Pharmacy Benefits Manager ("PBM"). PBMs manage prescription benefits for their clients (insurance companies, employers, unions, governments) ("Payers"). The PBMs negotiate with retail pharmacies and mail-order distributors to get the best deal for the Payers and the Payers' subscribers. The parties describe this three-tiered system (Payers-PBMs-Pharmacies) as a complex structure applicable to the pharmaceutical industry. ECF No. 27 at 6. CVS owns both a PBM (CVS Caremark) and thousands of retail pharmacies throughout the country. CVS Caremark also has a mail-based pharmacy that competes in the retail market.

In addition to negotiating with retail pharmacies, the Executive Committee tasked Mr. Lavin with analyzing the terms it had with mail-in retail pharmacies for his last three years at CVS Caremark. He took part in "executive-level strategy" with other CVS executives in both the PBM and retail business. This mattered to CVS because of Amazon's entry into the pharmacy business through its acquisition of PillPack, a mail-in retail pharmacy.

Mr. Lavin signed the Agreement with CVS in 2017. ECF No. 27-4 at 10-18. In exchange for signing the Agreement, CVS awarded Mr. Lavin Restricted Stock Units ("RSUs") that had a value of $157,500. *Id.* at 1-8. The RSU agreement states that the "award of RSU's . . . is expressly subject to and contingent upon the requirement that [Mr. Lavin] shall have fully executed and delivered [to CVS] the Restrictive Covenant Agreement provided by [CVS]." *Id.* at 7, § 12. The Agreement, under the section captioned "Consideration for Agreement" states that CVS "has awarded [Mr. Lavin] restricted stock units contingent on the execution of this Agreement and compliance with its terms." *Id.* at 10, § 1.

The Agreement mandates that during his employment with CVS and for 18 months thereafter, Mr. Lavin will not "directly or indirectly" engage in Competition with a Competitor.

- *Competition* is described as "providing services to a Competitor of [CVS] . . . that: (i) are the same or similar in function or purpose to the services [he] provided to [CVS] at any time during the last two years of [his] employment by [CVS]; or (ii) will likely result in the disclosure of Confidential Information to a Competitor or the use of Confidential Information on behalf of a Competitor." *Id.* at 10, § 2(a).
- A *Competitor* is defined as any entity that "competes with one or more of the business offerings of [CVS] . . . includ[ing] (i) [PBMs] . . . (ii) retail . . . ." *Id.* at 10, § 2(b).

3

The year after he signed the Agreement and received the RSUs, Mr. Lavin began discussions with PillPack about employment. He interviewed with both PillPack and Amazon executives. PillPack offered Mr. Lavin a job as "Director [of] Third-Party Networks & Contracting" reporting directly to PillPack CEO TJ Parker. ECF No. 27-8 at 37.

Exactly what Mr. Lavin would be doing with PillPack seems to be a moving target. His role and responsibilities at PillPack seem to ebb and flow with this litigation.[1] While PillPack now asserts that Mr. Lavin would be negotiating only with PBMs (excluding CVS Caremark[2]) on behalf of PillPack, the original job description of the position for which PillPack hired Mr. Lavin also included negotiating with Payers. ECF No. 27-8 at 37-38.

Mr. Lavin is also expected to contribute to PillPack's overall growth strategy and help drive its long term disruptive strategy. PillPack CEO TJ Parker stated that he expected Mr. Lavin to "contribute significantly to [PillPack's] procurement efforts ... and help [PillPack] develop a long term disruptive strategy." *Id.* at 35. Mr. Lavin told one of his job interviewers from PillPack that he was "excited about the opportunity for disruption and the strategic components of the work." *Id.* at 34.

## II. STANDARD OF REVIEW

To obtain a preliminary injunction, the burden is on CVS to establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm with no

---

[1] *See* ECF No. 27 at 26, n.5.
[2] PillPack claimed after Mr. Lavin left CVS that it would wall off Mr. Lavin from any negotiations between CVS Caremark and PillPack. ECF No. 27-7 at 45.

4

preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The court should not award the "extraordinary and drastic remedy" of a preliminary injunction unless CVS meets its burden of persuasion with "substantial proof." *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks omitted); *see also Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (describing a preliminary injunction as an extraordinary remedy).

## III. DISCUSSION

The Court must first determine if Mr. Lavin's new position with PillPack violates the Agreement–will the new job have Mr. Lavin directly or indirectly engage in Competition (described as either (1) providing services that are the same or similar, or (2) likely to disclose Confidential Information) with a Competitor of CVS? If it does not, then the analysis ends, and Mr. Lavin is free to join PillPack in his new position. If the new position does violate the Agreement, the Court must then determine whether the Agreement violates public policy because it is not "reasonable." And finally, the Court must determine if all the factors for issuing a preliminary injunction exist.

A.   Does the New Job Violate the Agreement?

   1.   *CVS's Position--Yes*

      i.   Same or Similar Services

CVS argues that the services Mr. Lavin will provide to PillPack will be the same or similar in function or purpose to the services he provided to CVS. At CVS, Mr. Lavin's primary responsibility had been negotiating with pharmacies on behalf of CVS Caremark. At PillPack, Mr. Lavin will negotiate with PBMs for PillPack's participation in Retail Networks. At both jobs he is involved with negotiations between PBMs and retail pharmacies, just on the opposite side of the table. At both jobs his primary goal is to achieve the most favorable terms for his employer in negotiations related to inclusion in the Retail Network. Mr. Lavin will also negotiate and build relationships with private Payers and public Payers, both of whom are current CVS clients.

Mr. Lavin is also expected to contribute significantly to PillPack's overall growth strategy and help drive its "long term disruptive strategy." ECF No. 27-8 at 35. He will be charged with building a strategy to engage directly with Payers that are traditional clients of PBMs. He is also expected to "own" PillPack's drug procurement strategy and relationships and "contribute significantly" to PillPack's pharmaceutical distribution as a service initiative, which includes collaborating directly with PillPack's wholesalers and manufacturers. ECF No. 27-8 at 35, 37.

As to mail-in retailers ("MIRs"), Mr. Lavin has negotiated at CVS with mail-in retail pharmacies and knows about the confidential pricing. In his last three years

6

at CVS, Caremark's Executive Committee tasked him with taking a closer look at its terms with MIRs for two critical reasons. First, some MIRs were misclassified as physical retail pharmacies and were collecting higher reimbursement rates; and second, CVS Caremark expected Amazon entering the mail-based pharmacy space and it wanted Mr. Lavin to lead the strategy to thwart this new competitive threat. CVS Caremark expected that a MIR with Amazon-like resources would want to displace CVS Caremark's mail-based services and become the exclusive mail-based provider for Payers. Mr. Lavin led the charge in formulating CVS Caremark's response. Usually Payers agree to make the PBM the exclusive mail provider for its members. Mr. Lavin had detailed knowledge about these rates and terms.

Fundamentally, Mr. Lavin will be doing the same job at PillPack as he did at CVS. Everything Mr. Lavin learned in his time at CVS—about the Retail Network pharmacies he negotiated against, the clients he was responsive to, and the initiatives that drive CVS's competitive strategy—will inform his work for PillPack.

### ii. Confidential Information

Mr. Lavin knew about CVS Caremark's contract with the pharmacies in their Retail Network, including pricing. He knows rates between CVS Caremark and the pharmacies. These rates are not public, and CVS Caremark is contractually bound to keep them private and spends much time and money to protect the confidentiality of this information. Mr. Lavin has knowledge that will allow him to strike more favorable deals for PillPack with CVS Caremark's competitors. He knows the best and worst terms between PBMs and retailers; he knows what specific concessions

7

CVS Caremark has made; and he knows CVS Caremark's pricing terms with their clients, the Payers.

Mr. Lavin interacted with and was privy to Confidential Information about both sides of the PBM business—the Retail Network and the Payers that are the clients of CVS Caremark. He needed to know what Payers wanted to get the best rates and terms in his negotiations with retail pharmacies.

Using his deep knowledge of CVS's rates, at PillPack Mr. Lavin could offer PBMs lower rates than other retail pharmacies have agreed to with CVS Caremark in exchange for preferred status as a mail-based pharmacy provider. This harms CVS retail and CVS Caremark, since both currently offer mail-based services. It also harms CVS Caremark because PillPack will be unfairly increasing its market share, which weakens CVS Caremark at the negotiating table with pharmacies and clients. Indeed, PillPack admits that it has started approaching clients directly to supply mail-based services and intends Mr. Lavin to lead its initiatives and strategies in this regard. Mr. Lavin's insider-knowledge about what clients want, how much they are willing to pay, and where CVS Caremark has strengths and weaknesses, positions PillPack to undercut CVS Caremark in its longstanding client relationships.[3]

Additionally, as a Senior Vice President, Mr. Lavin also took part in executive-level strategy, where CVS-wide Confidential Information was discussed, and plans

---

[3] While true that Mr. Lavin could not access the pricing terms the retail pharmacy obtained from other PBMs (and vice versa), he was not otherwise barred from accessing information about the retail pharmacy business—as shown by the enterprise-wide strategic information to which he had access.

8

formed to thwart competitive threats including Amazon's entry into the mail-based pharmacy space.

### 2. *John Lavin's Position–No*

#### i. Same or Similar Services

Mr. Lavin's job at PillPack implicates a vastly separate set of responsibilities, functions, and priorities. Mr. Lavin's role will involve negotiating only with PBMs other than Caremark. ECF No. 33-3 at 8, ¶ 21. PillPack is not a PBM and does not compete with Caremark. PillPack is an innovative retail pharmacy that, at best, competes with CVS's retail pharmacy business in discrete areas. Thus, Mr. Lavin's new position at PillPack will neither have him providing services in Competition, nor have him work for a Competitor.

#### ii. Confidential Information

Mr. Lavin worked for CVS Caremark, CVS's PBM business. He never worked for CVS's retail pharmacy business and could not have learned Confidential Information about CVS's retail pharmacy business in his role at CVS Caremark because, as CVS represented to the public and to the Federal Trade Commission, a "comprehensive" firewall exists between CVS's PBM and retail pharmacy businesses. Mr. Lavin never negotiated with PBMs on behalf of CVS's retail pharmacy business and never had any involvement in CVS's retail pharmacy business' multi-dose packaging offering. Mr. Lavin does not have Confidential Information that would be suspectable to disclosure in his new position.

9

### 3. *Court's Analysis–YES*

The Court finds that CVS has shown, with substantial proof, that Mr. Lavin violated the Agreement by accepting the position of Director of Third-Party Networks and Contracting and entering an employment contract with the PillPack division of Amazon. The facts prove that under the Agreement, PillPack is a Competitor and that in this new job, Mr. Lavin would be involved in Competition. The services Mr. Lavin would supply at PillPack are substantially the same or similar to the services he supplied at CVS and it is likely that Confidential Information could be disclosed.

#### i. Same or Similar Services

At both jobs, Mr. Lavin's primary focus will be to achieve the most favorable terms for his employer in negotiations related to network inclusion. His job at PillPack will be the same–just on the opposite side of the negotiation table, as CVS argues.

Because one job is from the PBM level of negotiations, and the other job is from the retail level, is not controlling in this analysis. The various levels in prescription drug commerce—from manufacturer of drugs through distribution to the end user—are integrated and interdependent. Payers (insurance companies, governments) who bear the burden of the costs of prescription medication look for the most efficient, effective, and least costly way of delivering drugs to their clients. They often use PBMs to manage this process and to seek the lowest costs for delivery of the medication. PBMs negotiate with retailers to set up Retail Networks to deliver the

medication. It also appears that PillPack, will be looking to negotiate directly with the insurers and others on the Payer level.

At CVS Caremark, Mr. Lavin's primary responsibility had been negotiating with retail pharmacies on behalf of CVS Caremark. ECF No. 27-1 at 1, ¶ 3.[4] That role has included setting strategy and executing on negotiations with mail-in-retail pharmacies, including PillPack. *Id.* at 7-8, ¶ 28.[5] In that role, he also had insight into the pricing and terms clients demanded so that he could negotiate against the pharmacies. *Id.* ("Mr. Lavin also has detailed knowledge of CVS Caremark's current and future strategy for dealing with mail pharmacies in its retail networks… including how CVS Caremark identifies whether such pharmacies should be deemed mail pharmacies, the terms and conditions under which they are permitted to participate in CVS Caremark's network, the rates that are offered (versus the rates

---

[4] "When CVS Caremark sets up a network of pharmacies to be included in a particular Payer's plan, it is driven by the Payer's needs and preferences. . .Mr. Lavin . . . handled the vast majority of negotiations with pharmacies in CVS Caremark's network." ECF No. 27-1 at 4, ¶¶ 16, 18. "Thus, Mr. Lavin has been involved to some degree in almost every negotiation between CVS Caremark and the 70,000 pharmacies in its network for at least the last 10 years." *Id.* at 5, ¶ 18.

[5] PillPack is one of the pharmacies in CVS Caremark's network and a Competitor to both CVS Caremark's mail-based pharmacy business and CVS Pharmacy's retail pharmacy business. ECF No. 27-1 at 5, ¶ 19. Negotiations with retailers is the crux of the CVS Caremark business. It is an extremely competitive business. *Id.* at 5, ¶ 20. "CVS Caremark, through Mr. Lavin and his team, has to negotiate increasingly better rates with the pharmacies in each contract term to remain competitive." *Id.* "Negotiations over those rates would be compromised, to CVS Caremark's detriment, if pharmacies in CVS Caremark's network knew the rates CVS Caremark agreed to with other pharmacies in the network, particularly in a one to two year selling cycle." *Id.* at 5, ¶ 21.

offered to retail pharmacies), and the rates charged to CVS Caremark's clients for CVS Caremark's own mail services.")

PillPack has already started contacting CVS Caremark's clients and PillPack's CEO would not deny that PillPack is planning to provide its own PBM-like services directly to clients. ECF No. 42-1 at 6. ("Is PillPack planning to build its own PBM? A. There are no immediate or firm plans to build a PBM, no. Q. Are there less immediate and less firm plans to build a PBM? A. We've explored a number of different things, as you can imagine, but no, there are no immediate plans.")

At PillPack, Mr. Lavin's primary responsibility will be negotiating with PBMs (other than CVS Caremark) over the terms for PillPack's participation in their Retail Networks, including the rates PillPack will charge PBMs for prescription fulfillment. However, in addition to negotiating with PBMs, Mr. Lavin will also oversee negotiating and building relationships with the private Payers (such as health plans and employers) and public Payers (Medicare and Medicaid). These are CVS Caremark's clients. ECF No. 27-8 at 37 (PillPack's job description for the role Mr. Lavin will perform states: "This role would lead all contracting, negotiation, and strategy with PBM's . . . private payers including employers and insurers, and public payers including Medicare and Medicaid."). Likewise, Mr. Lavin will lead PillPack's drug procurement strategy and relationship and contribute to Amazon-PillPack's "long term disruptive strategy." ECF No. 27-8 at 35.

The Court concludes that Mr. Lavin's role at PillPack would be the same or similar to the role he had at CVS Caremark in many relevant respects.

### ii. Confidential Information

Even if the positions were not the same or similar, Mr. Lavin's new position would violate the Agreement because it "will likely result in the disclosure of Confidential Information to a Competitor."[6] ECF No. 27-4 at 10, §2(a).

Confidentiality of pricing and relationships is an extremely high priority in this competitive business. "CVS Caremark's contracts with pharmacies typically require CVS Caremark to maintain as confidential the agreed-upon rates and other material terms. CVS Caremark is not permitted to share this information with third parties, including other pharmacies." ECF No. 27-1 at 6, ¶ 22. While there is a firewall between CVS Caremark and CVS Retail on pricing, Mr. Lavin "has negotiated with CVS Pharmacy's retail pharmacy business as one of the pharmacies in CVS Caremark's network. So he knows the rate CVS Pharmacy's retail pharmacy business charges CVS Caremark." *Id.* at 6, ¶ 24.

Mr. Lavin also participated in weekly executive underwriting calls to discuss negotiations with CVS Caremark's largest clients and prospective clients, with three or four clients per call generally. *Id.* at 13-14, ¶40. CVS goes to great efforts to protect CVS Caremark's confidential contract terms with Payers. *Id.* at 15, ¶ 43. "In fact, the CVS Caremark employees responsible for handling the client accounts on a day-to-day basis in the sales and account management functions are provided less

---

[6] PillPack is a Competitor of CVS under the Agreement even though it is considered a retail pharmacy and CVS Caremark is a PBM because the Agreement defines Competitor as one on all levels of the business, both PBM and retail. ECF No. 27-4 at 10, § 2(b).

13

information about client contract terms than Mr. Lavin had been given by virtue of his senior leadership position within the business." *Id.*

Mr. Lavin has also been involved in high-level strategic planning for CVS giving him advanced and complex knowledge of the company's internal strategies for the future. He was "deeply involved in CVS Caremark's strategy for the upcoming selling season, which necessarily includes pricing and other types of very sensitive information to be used for at least the next 12–18 months and, in most cases, up to 36 months." *Id.* at 6, ¶ 25. The position between Payers and pharmacies means he had "access to significant amounts of confidential information from both sides of the transaction, including pricing, drug acquisition costs and rebate rate." *Id.*

Mr. Lavin took part in the "2019 Enterprise Strategy working group tasked with creating new pharmacy reimbursement models for the upcoming selling season," including "strategies for retail reimbursement rates, including ways in which retail could increase its performance to offset deeper cuts in reimbursement rates." *Id.* at 7, ¶ 26.[7] "As a senior executive, Mr. Lavin attended and participated in several CVS Caremark Executive Committee meetings," focused on its "highest priority initiatives and strategies and attendees are privy to CVS Caremark's most confidential and competitively-sensitive information, including financial information, pricing strategies and other business strategies." ECF No. 27-2 at 2.[8]

---

[7] Mr. Lavin received a copy of a comprehensive Enterprise Strategy presentation which "discusses strategy to 'develop joint solutions to better align the incentives of [CVS's] Retail and PBM businesses.'" ECF No. 27-1 at 7.

[8] "As a result of Mr. Lavin's 2016 presentation to the Executive Committee, CVS Caremark began strategic initiatives related to mail and retail pharmacies" and

14

During his employment with CVS, Mr. Lavin obtained "detailed knowledge of CVS Caremark's current and future strategy for dealing with mail pharmacies in its retail networks...including how CVS Caremark identifies whether such pharmacies should be deemed mail pharmacies, the terms and conditions under which they are permitted to participate in CVS Caremark's network, the rates that are offered (versus the rates offered to retail pharmacies), and the rates charged to CVS Caremark's clients for CVS Caremark's own mail services." ECF No. 27-1 at 7-8, ¶ 28. He was also intimately involved in "CVS Caremark's strategy to differentiate its mail-based services from potential competitors." *Id.* at 9, ¶ 33.

After reviewing all the evidence, the Court finds that the services Mr. Lavin was to perform at PillPack, a Competitor in the industry, are substantially like the services he provided for CVS Caremark. Moreover, the Court finds that it is highly likely that Mr. Lavin's new employment will result in the disclosure of Confidential Information to CVS's Competitor.

---

subsequently "launched a new program for mail-in retail pharmacies, which was led by Mr. Lavin and his team." ECF No. 27-2 at 5, ¶ 12. Mr. Lavin also had access to confidential and competitively sensitive information related to CVS Caremark's and CVS Pharmacy's costs of goods sold ("COGS"), the prices that each business pays to acquire medications from its wholesalers. *Id.* at 5, ¶ 13. "One area where information about CVS's COGS will be especially useful to PillPack is in its specialty pharmacy business—a mail-order pharmacy benefit focused on specialty medications that are high in cost or complexity. This is the fastest growing part of the pharmacy benefits industry and one of CVS's leading revenue streams...Mr. Lavin has the exact information PillPack would want to grow this area of its business." ECF No. 27-2 at 6, ¶ 14.

B.   Is the Agreement Reasonable?

It is well settled that covenants not to compete are disfavored and subject to strict judicial scrutiny. *Durapin, Inc. v. American Products, Inc.*, 559 A.2d 1051, 1053 (R.I. 1989). As a result, Rhode Island courts will uphold and enforce such provisions if, *inter alia*, the party seeking to enforce the noncompetition clause (the promisee) shows that the provision is ancillary to an otherwise valid transaction or relationship, and that "the contract is reasonable and does not extend beyond what is apparently necessary for the protection of those in whose favor it runs." *Id. See* Restatement (Second) *Contracts* § 188 (1981).

*Cranston Print Works Co. v. Pothier*, 848 A.2d 213, 219 (R.I. 2004); *see also Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 14 (1st Cir. 2009) (*citing Koppers Prods. Co. v. Readio*, 197 A. 441, 444–45 (R.I. 1938) (stating that "noncompetitive employment contracts are carefully scrutinized by the court and only enforced when reasonable and when the restriction does not extend beyond what is apparently necessary for the protection of those in whose favor they are made")).

To enforce a restrictive covenant under Rhode Island law and establish that the Agreement is enforceable, CVS must show that "(1) the provision is ancillary to an otherwise valid transaction or relationship; (2) the provision is supported by adequate consideration; and (3) it has a legitimate interest that the provision is designed to protect." *R.J. Carbone Co. v. Regan*, 582 F. Supp. 2d 220, 224 (D.R.I. 2008) (*citing Durapin, Inc. v. Am. Prods., Inc.*, 559 A.2d 1051, 1053 (R.I. 1989)).

Associate Justice of the Rhode Island Superior Court Michael A. Silverstein well set forth the standards courts applying Rhode Island law should use in evaluating these covenants:

> The "crucial issue" in considering the enforceability of a non-competition agreement is its "reasonableness." Reasonableness of non-competition

16

agreements "turns on: (1) whether the provision is narrowly tailored to protect the legitimate interests; (2) whether it is reasonably limited in activity, geographic area, and time; (3) whether the promisee's interests are not outweighed by the hardship to the promisor; and (4) whether the restriction is likely to injure the public.

*****

In the end, the reasonableness "must be decided on the facts of the case within the framework of these limitations." However, reasonableness is "ultimately a question of law to be determined by the court." Rhode Island courts may modify or "blue-pencil" non-competition agreements to make them reasonable and enforceable.

*F. Saia Restaurants, LLC v. Pat's Italian Food to Go, Inc.*, No. PB 12-1294, 2012 WL 2133511, at *7 (R.I. Super. June 06, 2012) (citations omitted).

The Court finds that the Agreement is reasonable. The non-competition provision in the Agreement is tailored to serve CVS's legitimate interest in protecting its Confidential Information and is reasonable in duration and scope. The 18-month time limit is also reasonable and is tied to the marketing calendar this competitive industry. ECF No. 27-1 at 3, 6, ¶¶ 13, 25 ("CVS Caremark typically enters short term contracts with pharmacies, usually locking pricing for one or two years before a new contract is negotiated and executed...the upcoming selling season, which necessarily includes pricing and other types of very sensitive information to be used for at least the next 12–18 months and, in most cases, up to 36 months."). The Agreement specifically and narrowly defines both what qualifies as "Competition" and who qualifies as a "Competitor" to protect its legitimate interests. The Agreement only prevents Mr. Lavin from providing services to a defined set of Competitors, including PBMs and retail pharmacies, where such services are "the same or similar in function

or purpose" or would likely result in the disclosure or use of Confidential Information.[9] ECF No. 27-4 at 10, §2(a).

Mr. Lavin was a high-level, senior executive at CVS who had significant company-wide strategic knowledge. The Agreement was narrowly drawn to address this legitimate concern on the part of CVS.[10]

### C. Has CVS Met the Burden for Issuing a Preliminary Injunction?

It is the plaintiff's burden to meet all the elements required before a court issues a preliminary injunction. "In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013) (*citing Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir.1996)). First, the Court has found above that, on the record before the Court, CVS is likely to succeed in its enforcement of the Agreement. Second, the risk of

---

[9] Mr. Lavin relies on *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700 (N.D. Ill. 2011) to show that the Agreement was unreasonable. But *Saban* involved a different restrictive covenant, in which "Competition" was defined to "mean engaging in *any activity* for a Competitor." *Id.* at 711. Mr. Lavin's Agreement is different from the restriction at issue in *Saban*, and more narrowly tailored. Thus, the "canyon-like coverage" and "deliberate overreaching" at issue in *Saban* simply are not present here. Moreover, Mr. Lavin's work at CVS was broad-ranging and entailed access to high-level strategy across the organization while Mr. Saban's duties at CVS were narrower in scope.

[10] Mr. Lavin's non-compete agreement with Amazon is more restrictive than the Agreement at issue in this case.

18

disclosure of this type of Confidential Information to a Competitor presents a sufficient risk of irreparable harm to justify a preliminary injunction. *See Harlan Labs., Inc. v. Campbell*, 900 F. Supp. 2d 99, 108 (D. Mass. 2012) ("As a general rule, a breach of non-compete agreements tied to trade secrets concerns triggers a finding of irreparable harm."); *see also Saban*, 780 F. Supp. 2d at 731 ("Rhode Island courts have enjoined former employees when the employee's knowledge of confidential information is likely to damage the former employer.").

Third, the equities weigh in favor of issuing an injunction. Mr. Lavin received over $150,000 in consideration for agreeing to the limited restrictions on future employment. Yet, less than a year after entering into this Agreement, he sought alternative employment where CVS Confidential Information will be at risk. Finally, the public has a strong interest in preserving the integrity of contracts and protecting confidential business information from competitors.

## IV. CONCLUSION

The Court does not grant a preliminary injunction to enforce a non-compete clause lightly. It is aware of the narrow and restricted application Courts should give to the agreements under Rhode Island law. However here, months after entering an independent stand-alone Agreement (limited to only 18 months post-employment) for which he was well-compensated, Mr. Lavin, a high senior official at CVS with access to very Confidential Information, went to work for a Competitor. That is wrong, and CVS is entitled to have the Agreement enforced.

The Court GRANTS CVS's Motion for a Preliminary Injunction. ECF No. 27.

IT IS SO ORDERED.

*/s/ John J. McConnell, Jr.*

John J. McConnell, Jr.
United States District Judge

June 18, 2019